21-607-66, FDA v. Wages and White Lion Invst v. Doing Business' Triton Distribution. I've got the parties backwards, but you know what I mean. We'll hear first from Mr. Heyer. I'm just wondering, did you orally argue the temporary injunction? We did not, Your Honor. That was on the papers. Okay. Good morning, and may it please the Court. And I'd like to reserve five minutes for rebuttal. Your Honors, before I launch into the arguments, I thought it would be helpful, because we didn't put any imagery in any of the briefs. There's been a lot of briefing about the different types of ENDS products that are out there and are at issue. So I brought a few just to show Your Honors, just so you would have an idea. You don't think we're vaping? I don't know, Your Honor. But these here are examples of a disposable product that's been referenced, this one here. This is an example without the cartridge of a cartridge-based product, again, a closed system. Both of these are closed systems. They have the e-liquid inside of the system. This is a sample of an open system device that's been referenced. As you can see, it's significantly different, significantly larger in size. It has a refillable tank here, a refillable container there. This here is one of the e-liquids that our clients manufacture that's used to fill this sort of open system device. How do you ignite them? Some have a button, and some are just... So do you inhale it? Is that what happens? You inhale, and there's an automated circuit that gets triggered that then heats the heating element. How do you do that with the cartridge, or is there something that it fits into? Sometimes they have buttons, and many of them, just the simple act of inhaling activates the circuitry. That activates the circuitry, and that, in turn, creates the... It aerosolizes the solution and delivers the nicotine and flavorings. It's important to note that even tobacco-flavored e-liquids are also artificially flavored. If you just had a nicotine e-liquid solution itself, there would be no flavoring in it at all. Anyway, we're here, though, in this case about FDA's arbitrary and capricious imposition of a comparative efficacy standard in its review of our clients' pre-market tobacco product applications under Section 910 of the Federal Food, Drug, and Cosmetic Act. As the Court's motions panel has already found, FDA's requirement that petitioners prove that their specific flavored e-liquids are more effective at promoting smoking cessation of combustible cigarettes than comparable tobacco-flavored e-liquids was arbitrary and capricious for several reasons. The first reason is one that's also procedural in nature, the lack of notice, what the motions panel described as a surprise switcheroo. This violated the petitioner's due process rights, and FDA entirely failed to consider... But didn't y'all get a lot more benefits than you could have if they had just deemed this to be under the statute in whatever it was, 2016, and then just stopped, deemed it? You guys would not be able to legally sell this, right? In terms of the deferred enforcement policy, Your Honor? Yeah, they spent a long time kind of backing and forthing with y'all, working with you, la-di-da-di-da, and now you're jumping on them that, oh, they're arbitrary and capricious. But couldn't they that day have said, boom, and you guys would have been out in the woods? They could have that day, but that's legally irrelevant to the Section 910 inquiry current before, or the NAPA inquiry before the court. That was arguably more relevant at the stay, on the stay motion, and I think Judge Oldham analyzed that accurately. But isn't it relevant to the totality of the circumstance? We've got to look at the big picture here. And they've been trying to work with you all. And all of these years have passed with little in the way of detailed studies. I think whether FDA has worked with the industry is certainly in the eye of the beholder, is I guess how I would characterize that. There is literature out there, there was extensive literature that was referenced and incorporated in our clients' PMTAs. Now certainly there are more data that benefits both the industry and FDA, because these products have been on the market this long. FDA can see what the actual patterns of usage are. And what they show is that youth usage of these types of devices that are compatible with our clients' e-liquids, and the hundreds if not thousands of other competing e-liquids that are out there, are extremely low compared with the disposable and the cartridge-based products. Yet what FDA has done is they've painted everything with all these products, if they have a non-tobacco flavor, with the exact same brush. And that's contrary to what FDA even said as recently as the beginning of 2020 in one of their guidances about how to, modifications they made to their enforcement policy. So is it a problem that every time they get rid of X, the young people just pick up Y? And so you have this dancing around. And so the notion that maybe I'd rather have A, but if I can't have A, I'm going to have to take B, why isn't that relevant to the, again, totality of the circumstances? Well, again, and FDA itself has said this, and the former FDA commissioner has said it, if we look at these devices, they're obviously very similar. And what happened is youth went from this device, a cartridge-based device, to disposable devices like this one. Both very similar, very small, easily concealable types of devices. What they have not done, of all the high school-age youth that vape, the recent National Youth Tobacco Survey says only 7.5% use this type of device. Now, is that National Tobacco Survey in the record, or were you doing outside the record the same as they have been? Well, it was in the record. The 2021 data was just released by CDC sort of contemporaneously, I think with the briefing, but there's 2020 data, there's 2019 data that was all certainly before FDA at the time. And it's the trend over time that's important. And it may tie in with the fact that federal law also increased the... Did FDA consider the impact of moving the age limit from 18 to 21? I think they referenced in the TPL report, in the technical project lead report, that that may play into the fact that overall youth usage of ENDS products has declined somewhat. And certainly if they're concerned about social sharing, if you have 18-year-olds that are high school seniors that can legally purchase the product and then distribute it in their high school to their friends versus the age of 21, you would expect that that would make a material difference, and I think it has. So your switcheroo or reliance argument depends on this notion that the FDA was requiring these long-term studies. I mean, the denial letter says there was a failure to submit long-term studies or other evidence that reliably and robustly evaluated the impact of their product on adult smokers switching, et cetera. Where are you getting this view that it's an absolute requirement to have these long-term studies? Because the proof is in the pudding. If we look at the review reports that they had, the check-the-box forms, as we call them, that's what essentially they were looking at. But it is not exclusively dependent on that, and I want to point the court out to a couple of citations in the record. If tab 6 of the joint appendix, if you compare, it's Triton FDA 1-280, which is the TPL report that was done on our clients' products, with tab 22, Triton FDA 2-4448. That's the 2019 final ENDS PMTA guidance. And what the PMTA guidance says is it says we will look at one point in time cross-sectional surveys on intentions of use and perceptions of use to look at the issue of cessation. But what does the TPL report after the facts say? It says we need to look at it at multiple points in time. One point in time is not enough. That's in the nature of the study designs. FDA could have said that in 2016 with the deeming rule. 2017, 2018, 2019, 2020, they didn't. They waited until after the fact, and therein lies not only the fact that they said it has to be a randomized control trial or a longitudinal cohort study, but the fact that they said what we previously said would be adequate isn't. We've changed our mind. Therein lies as well the surprise switcheroo, and that came after the fact. So the statute itself, forgetting what the FDA said, it says the application must show that your product, basically, a new product, a tobacco product, presents less risk than other tobacco products. So why isn't the agency entitled to say, based on a whole slew of research and just common sense, that the flavored e-cigarettes present more of a risk than tobacco-flavored e-cigarettes, given that flavored cigarettes are going to have much more of a youth enticement? One, I disagree with the notion that there's been a scientific consensus in the literature. That's something that FDA's argued, something the Breeze Smoke Sixth Circuit Panel latched onto. Secondly, when 7.5% of the kids that are using these products, only 7.5% are using these, and there's no evidence that a single high schooler or middle schooler is using it with our client-specific product, it's too broad brush of a conclusion. And FDA needs to do a 360-degree review of all of the elements. In fact, that's what they promised, both in their proposed rule and in their final rule. 7.5% using that type of device is a lot when you're talking of millions of kids from the studies are using this overall. And it seems like the studies do show very small numbers of youth use tobacco-flavored e-cigarettes, which the FDA is pretty, my understanding, is approving those left and right. Well, there's been one ENDS product, one ENDS product out of all of them that have been submitted. Generally, though, that tobacco-flavored e-cigarettes are widely approved. No, there's a single product that's been approved, and it was approved after these MDOs were issued. I thought more or less the FDA. Which therein lies another issue. What is the comparative product supposed to be when at the time these MDOs issued, there was not even a tobacco-flavored ENDS product that had been approved? So we have a new standard, and we don't even know what we're supposed to compare it to because FDA at that point in time had not even approved another tobacco-flavored ENDS product. So what's the point of the flight of having these flavors like Jimmy the Juice Man's Strawberry Astronaut? That's appealing to 40-year-olds? It is appealing. I guess I hang out in the wrong circles. It is appealing, Your Honor. I don't know the exact statistics, but I believe it's more than a majority of adult users of ENDS products. And these are people, as I think the amici rightly put it. And they do like Jimmy the Juice Man Astronaut. They do, Your Honor. And as the amici properly point out, the people that have the highest physiological health risks associated with combustible cigarettes are those that have been smoking for decades. And they may oftentimes, in fact the literature bears this out, they don't like the tobacco and menthol flavors because it reminds them of those cigarettes. So they migrate over time, even if they may start with those. Okay, the only thing that keeps you all alive is this notion that people already addicted are switching to e-cigarettes, which is still dangerous, but not as dangerous. That's really the only thing keeping you alive, right, in this process. Well, certainly, I mean, that's the reason the whole industry began, was to help addicted smokers switch to a significantly less harmful. FDA itself recognizes it's significantly less harmful. Does the nicotine itself have bad physiological effects other than that it's addicting the same way sugar is addicting? They're minor. It is not a carcinogen, and FDA readily admits that and has said that on the record. It's not carcinogenic. It does have, nicotine does physiologically have some effects, cardiovascular effects and that sort of thing, but they are minor compared with what comes from the tar of a combustible cigarette and the carcinogenic effects of that, for sure. Okay, let me ask you this. If we were to reverse, where is there any support for the notion that we then give you a, don't you have to go back to the FDA and still get approval? It just would be they need to sort of like retrying the case in front of a new jury because you've admitted the wrong evidence or something, right? Yeah, it goes back in the hopper, but if the court agrees with my notion that the FDA lacks statutory authority to even impose a comparative efficacy requirement, because this is effectively a drug standard on steroids, then what we would request is actually an injunction. If FDA is going to insist on the standard for my client to have true and complete relief, my client needs an injunction against further adverse action. Okay, where is there anywhere authority for us to do that? The Monsanto case, Your Honor. The Monsanto case from the Supreme Court in 2010, which says essentially if complete, if in addition to vacate or under the APA, if meaningful practical relief is required, that's when an injunction is appropriate. But it wasn't this kind of injunction that you're asking for. Well, if you declare that the statute, I mean that the regulation doesn't conform to the statute, then you say the regulation is vacated. Well, it's not an issue of the regulation. But that's different from the 18 months. Right. The problem is if it just is sent back tomorrow, what's to keep FDA 30 days from now from reapplying it? My client, if this is going to be the new standard, since my client did not have notice, my client needs an opportunity to go and conduct these comparative efficacy standards and come back and present it to FDA. Otherwise, it does not have the complete relief that it needs to remedy the error. Well, that's different from us saying they can't ask for that. You said earlier that we should order that they cannot ask for those kinds of studies. Yes. That's to me a shocking concept since the statute, I think, clearly allows them to ask for that. Your Honor, the way I would explain it is to ask for evidence that these products promote cessation is not inappropriate. But to say it must be cessation squared, that it must be comparative, and that the flavored products, that an applicant must show the flavored products are more efficacious at proving cessation, this is my statutory interpretation argument in comparing it with the drug, the safe and effective standard. You're saying it must go above and beyond what must be proven for a nicotine replacement therapy drug. But Congress really wanted the FDA to put some, to really cubby this. That was the whole reason they passed the statute. If they just wanted all this stuff to be flowing around, they wouldn't need the statute. So don't we need to defer somewhat to the FDA on all this? On that point, Your Honor, they lack the statutory authority because they're taking a drug standard and going above and beyond. It's cessation squared is sort of my shorthand reference for it. And that's why I think they lack the statutory authority to do that. Well, let me just ask you one question. In what way, two-part, A, has FDA's position changed since your briefing in regard to the temporary injunction? And B, has your briefing changed? And I say them out of time, Your Honor. Effectively, no. The arguments are the same. I think the same conclusions should hold. Okay. Thank you. Thank you, Your Honor. All right. Mr. Katzen. May it please the Court, Noah Katzen for the government. In the Tobacco Control Act, Congress directed the Food and Drug Administration to deny approval for any application for a new tobacco product unless the evidence in the record affirmatively shows that marketing the product would be a net public health benefit. Triton failed to make that showing in this case. It said no. It's appropriate for public protection of public health. That's not the same as a net benefit. I think it is the same, Your Honor, because the statute requires the assessment of whether a product is appropriate for the protection of public health to be made by comparing the risks and the benefits to the population as a whole. This is in subsection C of 21 U.S.C. section 387J. And evidence in the record demonstrates that flavored e-cigarettes, by virtue of their flavors, pose an added risk to youth above and beyond the risk posed by tobacco-flavored e-cigarettes. Well, why didn't FDA simply ban all flavored products? I mean, because that's what you're trying to do, but you're doing it by indirection. Why didn't FDA just say, oh, it's the risk to the children, and so we're banning all the flavored products? Because FDA is willing to consider on a case-by-case basis whether flavored products meet the statutory standard. The standard, again, is appropriate for the protection of public health. Tell me how you did this on a case-by-case basis when the so-called DMOs for both of these entities are almost precisely the same. You know, that reflects the fact that many of these applications for flavored products all suffer from similar deficiencies. Particularly, they tend to have a lack of evidence that flavors, a lack of robust and reliable evidence that flavors help adults quit smoking. And that's the kind of evidence that would be needed. What is robust and reliable evidence according to the FDA? Robust is the most overused adjective in the world right now, and it's just not meaningful to me. Your Honor, it's difficult to assess that completely in the abstract. What FDA would look for is a demonstration that the product shows a benefit over time. Ah. And when have you consistently said that the product has to show a benefit over time in comparison with their evidence that in at least two public meetings for which they have quotations and in previous guidance, they said you don't have to have over time studies? Your Honor, on page 299 of the Joint Appendix, which is the 2019 guidance, FDA said that an applicant need not submit long-term studies, but it had to extrapolate from short-term studies to demonstrate possible long-term health impact. There is a distinction between requiring long-term studies and looking at short-term studies to see if there is a long-term impact. In both the 2019 guidance and the decision document in this case, FDA said that long-term studies are not necessarily required. Correct. Because the applicant would have to show a health benefit over time. And the conclusion here was they did not. The conclusion here was that they did not show that. Through any mechanism, be it the long-term study or something else. That's correct, Your Honor. And they admit that the general literature is inconclusive. And FDA has admitted that there's little availability of long-term studies of these products, right? There's little availability. I believe that's correct, Your Honor. But the statutory burden requires FDA to deny the application unless there is a showing on the evidence in the record that the benefits outweigh the risks. How do you square this? How do you square this, what you say is a plain indication of long-term effect, in your 2019 guidance with what was said in July of 21, which was long-term studies? Just disregard these applications if they have no long-term studies. Are you referring to the memo that FDA issued and rescinded? And the decision document reflects that FDA did not look solely for long-term studies. Not the decision document, the internal memorandum. I need to look. I'm sorry, there's so many references to things in here. The internal memorandum was rescinded by the agency. And what the decision document reflects is that FDA did not do what that internal memorandum was suggesting. It reviewed the record for both internal studies and the memorandum. Oh, so the memorandum said do this and FDA did something else? After it rescinded the memorandum, FDA decided to look. And where's the document that rescinds that memorandum? It's in the record, Your Honor. I don't have it. But that document of rescission was on August 26th, right? I believe that's correct. So, and all of these things were denied around September 9th, were they not? That is correct, Your Honor. So in less than two weeks, two, maybe ten business days, FDA could turn on a dime and suddenly review all of these. And, oh, by the way, of course it forgot to say anything about reliance and it disregarded the marketing impact altogether, right? Your Honor, FDA had these applications and had been reviewing them since September of 2020. I find that difficult to believe since there were at least 50,000 of them. Triton's application was received in September of 2020. And the July memo said we need to clear the decks here by September. We need to get rid of as many of these as possible. And then they issued this very brief decision document. Your Honor, the decision document reflects that FDA looked both for long-term studies and other evidence. And importantly, Triton's other evidence does not make the showing required by the statute. It consists of literature that they say is, that they admit is inconclusive. And it consists of survey data that looks only at consumer preferences for flavors. But, again, if we look at the totality, you all could have found this illegal from day one once you did the deeming instead of giving some time. And you all were willing to give more time, but a court ordered you to give less time. And then we had the pandemic. And so there's been a lot of, you know, back and forth, right? And you all were just trying to deal with that. Is that a fair statement? That's true. That's true, Your Honor. FDA was not required to ban these products. The statute permits it to evaluate on a case-by-case basis whether they are appropriate for the protection of public health. But you were not, having done the deemer, at that point you were not required to let them keep going until they applied for the permit and you gave it to them. That's correct. But you let them keep going, but they're still accusing you of a switcheroo when you switcherooed in their favor. That's correct, Your Honor. These products have been unlawful, unlawfully marketed since 2016. What do you say about the marketing plan? The denial shows no real analysis of it, or was it considered at all? Sure. So the FDA's evaluation has to be, a statement there has to be looked at in the context of its experience, as outlined in the 2020 guidance, which has been that access restrictions of the type that Triton has proposed, age-based verification restrictions, simply do not work very well. How do you know what their proposal was? Was it looked at? How do we know that? It's described in the narrative part of the application. So the FDA would have been able to see if it was something novel or materially different. Yeah, but FDA ignored it. They didn't, I mean, I believe the DMO said nothing about it, and even the Sixth Circuit opinion acknowledges that. The technical project lead, which is the document that explains the agency's decision in this case, Your Honor, to tab six of the Joint Appendix, explains that, invokes FDA's experience with access restrictions, age-based verification. I understand that, but there's not a word, that doesn't mean you read it, does it? I mean, you know, Judge Oldham characterized that as, I've read briefs like this a thousand times. I don't need to read them again. And besides that, they said they're not doing advertising. These things are only available in vape shops. They have to show proof of age at the vape shop. There are a number of qualifiers on how they are going to distribute these particular products. And, you know, FDA can't just say, we've seen this all before. No, I mean, unless, is it like the section of the convenience store that used to have all the adult magazines behind a screen or something? No, it's more complex than that. So don't you think you ought to have, since that was one of the most important criteria, if I recall correctly, that FDA should have at least touched on it? The marketing plan was described in the narrative report, so FDA would have been aware if it contained anything novel or mature. And FDA had said in its menu of standards that must be considered, that the marketing plan must, I mean, you should give up on this because even the Sixth Circuit said that FDA ignored that and it was, quote, harmless error, which we can discuss if you like, but. Well, if the court wants to turn to harmless error. No, I don't want to turn to harmless error. I want you to admit that FDA didn't consider marketing. Your Honor, I don't admit that. FDA invoked its experience in the footnote in its decision document. Well, then again, FDA ought to say, since the state of the science is inconclusive whether flavored products assist smokers in stopping the smoke in a robust way that overbears the attractiveness to youth, then no, we are not going to approve any applications. If FDA is going to rely on inconclusiveness, then you're setting up, you're making thousands of these producers waste thousands and thousands of dollars on what is a fruitless exercise. I don't think it's necessary for FDA. I don't think it's necessary for FDA to do that and preclude the possibility of a manufacturer demonstrating that its products are appropriate for the protection of public health. Triton has not pointed to anything in its marketing plan. Has FDA since approved a single flavored product to this point? Not to my knowledge, Your Honor. Triton has not pointed to anything in its marketing plan that is materially different or novel How do you know? Because you don't even allude to what those plans are in your briefing. Your Honor, Triton has submitted several briefs in this case, and they have not pointed to anything in their marketing plan that is novel or materially different. How am I supposed, why am I supposed to, you know, that's just a naked assertion. It's not, unless you've got some specific evidence other than we are the FDA, we know better. It seems to me that's the height of arbitrariness and capriciousness to say we are the FDA, trust us. Which I might say some of us are becoming skeptical about in light of recent vaccine experience. Your Honor, the 2020 guidance explains FDA's experience with access restrictions and that they don't work very well in light of youth getting their e-cigarette products from social sources. So let me ask you this. I mean, let's get to a bottom line. What if we were to conclude that the FDA failed to make sufficient findings on things like advertising and so forth? What then? What do you direct? I know you don't want us to find that, but if we did and we found it was not harmless error, then what? Again, I think it's an error, but assuming the premise, assuming the court finds that there was an error and it was not harmless, the proper remedy would be a simple remand to the agency to act consistently with the court's opinion. And if we were to affirm, we just wrote affirm 47-6, I don't think that will be the opinion. But let's say it was. Would they not have the opportunity to apply again? Yes, Your Honor, they would. Okay. So either way, this is going to end up in the FDA's bucket. If we reverse or we affirm, right? It's just a little different bucket. If you affirm, that's up to Triton whether they apply again. They're out of business if we affirm, right? Well, they have said that they'd like to submit additional evidence. They could resubmit an application with additional evidence. Well, you're talking a long-term study. You don't just do a long-term study since September 20 until today, right? That's correct. I don't know what the long-term is here. What is the long-term, by the way? A long-term study is defined as more than six months, Your Honor. It's up to Triton whether it submits an application again. That's not my department. I don't decide that. If it does choose to submit an application, it may do so. What about my questions for the other side? Maybe I was at a misunderstanding. I thought the tobacco-flavored products were routinely being approved. Is that not right? I believe they're correct that one has been approved thus far. Okay. But what the other ones, have they just not been ruled on? So that's why they're widespread still on the market because you gave this grace period, basically, to allow people to remain on the market? That's correct, Your Honor. How many have been denied tobacco? I don't have that information. Triton has been aware since the late 2020 guidance, which emphasized this, that FDA is concerned about the role of flavors in their devices, and these applications, both tobacco and flavor, have been under review simultaneously for some time. So it is not a surprise to Triton that it has to show that the flavors have had a benefit. Let me just ask you this. Do you agree, if we were to affirm, do you agree that under Monsanto we would still have the ability to grant this 18-month injunction to allow them to file a better application? No, Your Honor. I think that would be more relief than they would be entitled to under the APA. The proper remedy is to simply vacate the agency's decision and remand. Okay. But if we affirmed? Their argument, I thought, was, like, if we affirmed, we still should give them time to file a new application. Oh, if you affirm, there's no remedy because you've affirmed. Okay. But we could know that they have the right to file a new application. We just couldn't grant any injunction on that. I don't see how that could be part of the relief if you affirm, because if you affirm, you're upholding the agency's decision. But then if we reverse, what is the difference between what they're arguing here and what Monsanto said was permissible? Why do you think it doesn't permit what they're asking for? Because they're effectively asking the court to prejudge an issue that's not before it. They've said that they relied on the 2019 guidance, which I've said FTA acted consistently with. But if the court concludes that there was an error there, then it's for FDA to determine in the first instance whether the reliance interests justify granting them more time to sit at studies. Regents made very clear that just because there's a finding that the agency failed to consider reliance, that does not mean that the agency is precluded from finding that notwithstanding the reliance, the agency was nonetheless justified in acting as it did. That's for the agency to determine in the first instance. Let me ask this. So if we were to reverse, they still don't have a permit to sell. So what happens in that time period? In other words, let's say we just said, we hereby reverse. Have a nice day. Now, what would happen then? And again, I don't think those would be our opinions, but just. Your Honor, they would be in the same position that they were in before FDA denied their application. So that would grant them all the relief that they could be entitled to. They would be. But then what if they didn't file a new application? They just said, hey, we won in the Fifth Circuit. We'll just take that and run. Then what? Could you prosecute them for failing to have a permit? No, because eventually, yes, because the statute says that it is unlawful to market a new tobacco product without an order from the FDA approving that marketing. And we don't have the authority to grant that order. That's correct, Your Honor. We have to send it back to you. But can we direct that you have to grant it? There would be no basis for doing that. FDA has to evaluate the evidence and make a determination on the basis of the risks and benefits whether marketing the product would be appropriate for the protection of public health. It would not be appropriate for the court to order FDA to do that. Can you conceive of any circumstances where a flavored non-tobacco or menthol-flavored product would get approval at this point in time? Your Honor, that's for the agency to determine. I understand that. But this is 2022, and all these thousands of applications were filed in 2020, right, by the deadline in 2020? That's correct. So FDA has had 15 months at least. Your Honor, to date FDA has not seen evidence that shows that the public health benefits of flavored e-cigarettes outweigh the risks. Well, how does FDA – I mean, at one point in your briefing you say that the facts have outrun their assertion that taking the cartridges off the market or making them more difficult and the fact that a lot – they have evidence from a National Youth Tobacco Survey that many fewer youth are now even using these kinds of products at all and a smaller percentage of that smaller percentage are using the bottled. How does FDA account for those changes? A couple of points in response to that. FDA addressed the role of device type in the decision document in this case on pages 89 to 90 of the Joint Appendix. What it explained is that flavors drive appeal and that youth preference for a particular device type depends on where the flavored options are. So what it's effectively asking FDA to do is to apply a more lenient standard toward open system products than to closed system products. Well, FDA had acknowledged there were differences in the market availability of those different kinds of devices. I don't think so, Your Honor. In earlier guidance, they quote from the guidances where FDA said there's a difference in the appeal to youth. I mean, yeah, flavors are important, but how they get them and how they can hide them from their parents is pretty important too. Right. On that point, I'll just say that I don't believe these are the only type of devices that are in existence. Cartridge-based devices can also be open system devices. There are closed system and open system cartridge-based devices. Well, we are talking about these particular. That bottle there is their product, and that little flask-like thing is what they put it in. Well, I believe there are cartridge-based open system devices as well. That's a lot tougher. You want these kids to turn to marijuana instead? I mean, it's a lot easier to hire the marijuana apparatus, speaking as a parent, than it is those things. Yeah. I'm not sure that they would have to use that big bulky thing is what I'm saying, Your Honor. But the main point is that FDA explained in the decision document in this case that what it finds is when flavors become less available in a particular type of device, youth migrate to other devices because flavors are what drive appeal. Any doubt about this should be resolved in favor of a criminal case. And the National Youth Tobacco Survey has no impact here. Is that right? That's a survey that they cite for saying that 7.5 percent. Well, you did too. I think they cite it for saying that 7.5 percent of their products will only be used for 7.5 percent of products. I believe that's not correct. The 7.5 percent refers to open system tank devices. There's another number of almost 30 percent for cartridge-based devices, which include open system cartridge-based devices. But either way, there's a significant number of youth who use the devices in question, and it was within FDA's discretion to determine that the risk posed by flavors is not sufficiently mitigated by current youth preference for particular device types. All right. Thank you, sir. Okay, Mr. Hire, we'll give you, what, one extra minute. I think I've reserved five, Your Honor, but okay. FDA's 2020 guidance says, at the same time FDA is aware that approximately 9 million adults currently use e-cigarettes, studies have shown that the majority of adult e-cigarette users use flavored e-cigarettes, and there is some evidence to suggest that flavored e-cigarettes may improve switching from cigarette smoking to using e-cigarettes compared to non-flavored e-cigarettes. This is Triton FDA 230302. This is FDA's own 2020 guidance. On the products that FDA has approved, there's been one tobacco-flavored product, which is a cartridge-based ENDS product, and FDA's whole narrative that it's the flavors that are driving this, that brand of product is the second most chosen product by high school-aged youth, even though it's only offered in tobacco and menthol flavors. Two of the top four in the NOITS survey are cartridge-based products that are only offered in convenience stores in tobacco and menthol flavors. They're not flavor-based. It is the device type and size that's driving youth initiation. It's not flavors. So shouldn't it be pretty easy to find a study that shows that? There are lots of studies. I refer the Court to the amicus brief filed by Dr. Abrams and Mr. Bates, that has, for example, real-world data from San Francisco, which barred flavors and has showed smoking rates increase since over time. There are plenty of real studies. You can take your mask off when you're talking to the Court. I'm sorry. It's a little more difficult text. Thank you. I apologize. No, there are plenty of studies that demonstrate that, and I point particularly to the amicus brief on that. Everything that Mr. Katzen respectfully said about the marketing plan is a post hoc rationalization. It's prohibited under Regents. It's prohibited under Motor Vehicle Manufacturers Association. We're talking about the amicus brief, which I read from the doctor right here. Was all that cited in the application? There was extensive literature that was cited in the application. I'm not sure timing-wise. San Francisco study, right? Yeah, I'm not sure if that one was a more recent study or not. I don't know off the top of my head. So y'all shouldn't benefit from post hoc if FDA can't either, right? True, but FDA is aware of the – Because y'all have the burden. We do. But the statute also says anything that is before FDA, regardless of whether it's from the applicant or not. So if FDA is aware of these studies, FDA should be taking them into account as well when it's reviewing these applications. What did FDA do? The MDO says FDA – it says explicitly – But you said the stuff that's happened since they shouldn't be considering, but now you're saying that we should be. Because the amicus filed it. I'm not sure of the exact timing of that particular study. The point is there's plenty of literature at the amicus site that was cited in the literature review in this PMTA that FDA itself says it didn't look at. It says all it looked for were randomized controlled trials, longitudinal cohort studies, and the supposed other evidence, which has never been defined. Well, the problem to me is that I can pretty much find any fact on the Internet if I want to. So we need a little bit more science to it than just someone said this or something happened somewhere that showed this. Because you can pretty much – you can find two articles on the Internet pretty much every day that say exactly the opposite about X, Y, Z.  These are all peer-reviewed published science, Your Honor. They're all in scientific journals. That's what the literature review is. Okay, but I'm talking about all of the things you're saying. That's what I'm talking about. It's peer-reviewed literature, peer-reviewed scientific literature, Your Honor. Let me ask about the remedy again. I know to change that's some questions. Let's say you prevail here in showing it's arbitrary and capricious. The way I look at it, imagine a business that needs to get a permit to build something. Say oil wells in the Gulf. And a federal agency denies their permit to construct the oil wells. And it comes up to a court, and the court says, yeah, there were problems with that denial. My understanding is that would be sent back. You wouldn't automatically get the permit to build the oil well in the Gulf, and you'd do a redo with the agency. And it seems similar here in that without the permit, you can't build the oil well. Without this approval, you can't market your product. So why is that not the same situation? And your injunction is really saying, well, since they gave us this grace period in the past, we're entitled to that again. But they had no legal duty to, as Judge Haynes has said, to give you that grace period. We're not asking for a grace period. What we're asking for is a grace period not on – we're not asking the court to order FDA to allow my client to continue marketing their product. FDA, as a matter of unwritten policy, is doing that. If we're put back in the bucket of an unresolved PMTA, which is what would happen, if the court – Okay, so if we said arbitrary and capricious and nothing else, remand, you would then be able to market the product. You'd be in the unresolved application process. Yes, absent enforcement action by FDA. What we're asking for is an injunction. Now that if FDA has – if the court finds that FDA has a statutory authority to demand this comparative efficacy data, notwithstanding my arguments to the contrary, then – and that's going to be the standard. Because this was thrust upon our clients after the fact, a year after the fact, they had no notice until August 26th. Then all we do is vacate the denial of the permit. No, the problem is, Your Honor, my client needs a reasonable opportunity to do the studies to meet that new standard. Well, I understand that, but why can't we assume – I mean, again, why doesn't – if the regulator's been reversed, what entitles the – so you're saying you're still illegal? I thought you were saying you were still in the bucket of unresolved. We'd be in the bucket, practically speaking, of deferred enforcement. You're just worried they're going to, within a month, say,  Exactly, Your Honor. It seems a little unlikely. They're so backed up with permits. I don't think they're trying again. But what have they done in the past? They've said, you know, cross-sectional surveys at one point in time are sufficient, and then they turn around a year later and say, well, actually, they're not. But haven't you had five years? The final guidance was only published in 2019. The proposed – the final rule that actually, as a matter of law, sets for requirements are going to – 2021. After this was denied. After it was denied. Okay, but that's the – the point is, you've had plenty of time. You guys should be wanting to do these reviews, and you've had plenty of time to do them. Because you claim to care deeply about this, and that you're just trying to address adults and not get to children. So you've had plenty of time to do a long-term study that's six months. No one – And not five years. But no one said until – until August 26, 2021, there was no indication from FDA that comparative efficacy was going to be the standard whatsoever. But if you actually cared, wouldn't you have done this study? Our position is, Your Honor – Not you personally, your client. But our position, Your Honor, is that the risk of – again, this is a – there's a balancing test. That the risk of youth denunciation is – of these products is far lower than FDA wants to paint it. And so the burden to show the efficacy at promoting cessation is also far lower. The fact that they've looked at this improperly infects the entire process and the entire weighing when they're weighing the risk versus the benefits. So as a result, if we reverse, this result hardly prevents FDA from doing what it will with the cartridge and the disposable product, right? Right. This is – this is a case about bottled e-liquid. Bottled e-liquid. Yeah. Okay. Yeah. I guess that's it. Thank you. Thank you, Your Honor. The court will stand in recess for probably less than 10 minutes. All rise.